# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Case No. 15bk38704 |
| Todd Williams, ) | Chapter 7 |
| ) | Judge LaShonda A. Hunt |
| Debtor. ) | |
| ) | |
| ) | |
| Todd Williams, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary No. 16ap00110 |
| ) | |
| U.S. Department of Education, et al., ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

This matter is before the court for ruling on the adversary complaint filed by *pro se* debtor/plaintiff Todd Williams ("Williams") against defendants United States Department of Education ("DOE") and Educational Credit Management Corporation ("ECMC"), (collectively "defendants"), seeking to discharge over $400,000 in student loans pursuant to 11 U.S.C. § 523(a)(8). After the court denied defendants' motions for summary judgment, the matter proceeded to hearing. Having now reviewed the pre-trial briefs, and considered the testimony presented at trial, joint stipulated facts, and all admissible evidence, the court finds that while Williams' circumstances are unfortunate, he has not met the "undue hardship" test. Therefore, his student loan debts are not dischargeable.

## JURISDICTION

The Bankruptcy Court for the Northern District of Illinois has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States

District Court for the Northern District of Illinois. This proceeding is a core matter in which this court has constitutional authority to enter final orders under 28 U.S.C. § 157(b)(2)(I).

## PROCEDURAL HISTORY[1]

Williams filed for bankruptcy protection in November 2015 and received a chapter 7 discharge in February 2016. Prior to his discharge, Williams initiated this adversary complaint against the defendants, asserting that repaying his student loans would cause undue hardship and therefore they should be discharged pursuant to 11 U.S.C. § 523(a)(8). Following discovery, the defendants each moved for summary judgment. The court denied those motions in an oral ruling, citing genuine issues of material fact that existed with respect to at least one of the *Brunner* factors,[2] and set a trial date. Williams inexplicably filed an appeal that was eventually dismissed by the district court for lack of jurisdiction. The trial was held on November 15, 2017. Williams was the only witness. Defendants each submitted sworn declarations about the student loans at issue here.

## FINDINGS OF FACT

### A.  *Educational & Loan History*

Williams attended college at Southern Illinois University from 1982-1985 but did not graduate. He moved on to Arizona State University and earned a bachelor's degree in mathematics and statistics in 1989. From 1993-1995, Williams pursued and obtained a Masters of Business Administration from University of Texas, Austin. Several years later, he resumed studies at

---

[1] The court takes judicial notice of the filings in Williams' bankruptcy case, 15bk38704, and this adversary proceeding. *See Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989).

[2] The Seventh Circuit follows the "*Brunner* test" when evaluating undue hardship from student loans. *In re Roberson*, 999 F.2d 1132, 1135 (7th Cir. 1993) (citing *Brunner v. N.Y. State Higher Educ. Servs. Corp.*, 831 F.2d 395, 296 (2d Cir. 1987).

2

Arizona State University, from 2003-2006, without obtaining a degree. Finally, Williams attended Governor's State University from 2007-2010 and earned a Master's of Art in Communications. (Joint Pretrial Statement ("JPS"), pp. 9-10, ¶ 12) (Adv. Dkt. #118)). Thus, Williams holds three degrees – BS, MBA, and MA – all financed with student loans. (Trial Tr. at 77:16-19).

Williams executed a note with the DOE on June 27, 2013. (O'Keefe Decl. ¶ 2) (Adv. Dkt. #115). As of September 2017, the principal balance owed on the loan was $100,449.99; accrued interest totaled $6,228.37 (6.8% annual rate), making the total balance due $106,678.36. (O'Keefe Decl., ¶ 3). Williams enrolled in an income-based repayment (IBR) plan with the DOE on October 9, 2016; his monthly payment is zero. (*Id.* ¶ 4). If Williams complies with the IBR for 25 years, any remaining balance will be forgiven. (*Id.*). Williams has never made a payment on the DOE loan. (JPS, p. 11, ¶ 10).

The principal balance of the loan from ECMC is approximately $279,718.55 with accrued interest of about $22,026.52 as of November 2015. (Klisch Decl. ¶ 6) (Adv. Dkt. #116). Williams was similarly approved for an IBR plan with ECMC on June 10, 2015. (Klisch Supp. Decl. ¶ 4) (Adv. Dkt. #119). That monthly payment is also zero, with a payment term of 300 months. (Klisch Decl. ¶ 7). Williams has never made a payment on the ECMC loan, either. (JPS, p. 11, ¶ 9).

In sum, Williams began taking out student loans in 1984 and continued through 2013. (ECMC Exh. 3, National Student Loan Data System). Sometime in 1990 or 1991, Williams made one payment of $140 towards his original, unconsolidated student loans. (Trial Tr. 54:10-14; JPS, p. 11, ¶ 8). As a result, Williams currently owes in excess of $400,000, mostly from compounding interest.

**B.    *Work History and Earnings***

Since 2011, Williams has been employed on a part-time, seasonal basis (usually April through October) for a flower shop, working about 20-25 hours per week during the season. (Trial Tr. at 63:7-10, 14.) He explained that his hours fluctuate; for example, in April and May, they may be as high as 35 or 40 hours per week, but in October, as things slow down, they may drop to 10-12 hours per week. (Trial Tr. at 65:21-25). Williams earns around $600 per month during this time. (Trial Tr. at 65:6-8). When the season ends in October, he is laid off and receives unemployment compensation of approximately $390 per month until his rehiring in the spring. (Trial Tr. at 64:12-21, 64:25-65:1; JPS, p. 10, ¶ 5). Williams also spends his time developing an online business of instructional videos which, to date, has not been profitable. (Trial Tr. at 76:10-18). In addition to his seasonal pay and unemployment income, Williams receives about $294 a month in food stamps. (JPS, p. 2, ¶ 9). Further, Williams regularly receives tax refunds when he is working, averaging between $600 and $800, but has never used them to make any payments on his student loans. (Trial Tr. at 66:6-8, 15, 20, 67:8-9).

Prior to the seasonal position, Williams' working career consisted of primarily temporary jobs and a few retail and warehouse positions. (JPS, pp. 10-11, ¶ 6). Historically, Williams earned about $16,000 in 1992; $11,000 in 1996, and $12,000 in 1999. (Trial Tr. at 51:17-19, 53:5-7, 53:9-10). *See also* (Williams Ex. 4, SSA Lifetime Earnings). 2001 was his best year, with over $28,000 from work at his father's warehouse, but that job ended mutually after a family dispute. (Trial Tr. at 53:15-16, 24-25; 54:4-6).

Williams testified that he has tried to get jobs using his mathematics degree and his MBA but nothing has worked out. (Trial Tr. 58:1-9). He has applied for temporary jobs, warehouse work and retail jobs, including seasonal jobs at Kroger and Kmart. (Trial Tr. 41:7-8, 68:17). In

4

2003, he reached out to temporary agencies in Arizona hoping to secure a financial analyst-related position, but after interviews, nothing materialized. (Trial Tr. 55:18-21, 56:4-5). In 2006, Williams interviewed with a film company in Arizona because he had a film portfolio. (Trial Tr. 57:22-24). Since 2014, he has applied to more than 70 positions but his current seasonal position is the only job he was able to secure. (Trial Tr. 41:10-14).

Most of Williams' free time is spent pursuing self-employment or looking for a job. (Trial Tr. 90:16-18). Williams believes that the best option for him now is self-employment, a goal he has been working toward since 2010. (Trial Tr. 91:14-16, 106:4-5). Specifically, he has been trying to start a business creating and selling instructional videos about car repair, bankruptcy and divorce. (Trial Tr. at 76:6-17, 19-23). Williams believes that unless this business gets going, he will not make more money. (Trial Tr. 77:23-25, 78:1-2.).

C. *Expenses*

Williams is currently 52 years old. Since 2007, he has lived with his aunt in her home in Park Forest, Illinois, a south suburb of Chicago, and he is not obligated to pay rent. He does make contributions to household expenses and utilities from time to time when he has extra money. (JPS, p. 10, ¶ 4). He expects this arrangement to continue indefinitely. (*Id.*; Trial Tr. at 71:21-23). Williams occasionally uses his aunt's car for transportation, but said he cannot keep it for an entire day. (Trial Tr. at 72:11-17). His fixed monthly expenses are $320-$400 for food and transportation, and $200 for cigarettes. (JPS, p. 11, ¶ 7; Trial Tr. at 72: 3-10). When he is working, Williams spends approximately $10 each day for lunch at restaurants near his job. (Trial Tr. at 73:23-24). Williams also spends $30 per year to maintain an internet domain name for his instructional video business. (Trial Tr. at 75:16-18).

### D. *Other Factors*

Williams maintains that a learning disability, depression, and anxiety all hinder his ability to find and maintain more lucrative work. (Trial Tr. at 88:7-8). Over the years, he has pursued rehabilitation services from state agencies in Illinois and Arizona. (Trial Tr. at 42:20-25; 43:1-4). He asserts that registering with and receiving services from these entities proves that he has a disability. (Trial Tr. at 42:21-23).

Williams participated in psychological examinations in 1983, 2003, and 2016. Based on his 1983 evaluation, Williams believed that he was diagnosed with a learning disability. (Trial Tr. at 36:18). His 2003 evaluation concluded that he had speech disfluency, a learning disability in the area of writing and organization and symptoms of attention deficit disorder, and stuttering. (Trial Tr. at 37:15-23). The evaluator recommended that Williams go into retail, start at the bottom level and work his way up. (Trial Tr. at 80:9-13). Williams admitted that he ignored that part of the evaluation. (Trial Tr. at 80:9-13). Similarly, the evaluator suggested that Williams pursue instructional videos as a hobby, advice Williams also disregarded. (Trial Tr. at 80:16-25; 81:1). At the recent 2016 evaluation, Williams was told again that he had speech disfluency. (Trial Tr. at 38:6-9).

Williams claims that his disability is "something you're born with and never goes away." (Trial Tr. at 37: 5-6). Even after being retested 20 years later, in 2003, "[n]othing really changed." (Trial Tr. at 37: 12-15). But Williams concedes that none of the evaluations concluded that he could not work. (Trial Tr. at 98:11-24). In fact, Williams admits that he can work full-time notwithstanding these limitations. (Trial Tr. at 64:4-5).

## CONCLUSIONS OF LAW AND ANALYSIS

The discharge provided by the Bankruptcy Code is meant to give debtors a financial "fresh start." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003). Nevertheless, student loans are one of the specific debts excluded from the general discharge by 11 U.S.C. § 523. Because they are presumptively non-dischargeable, debtors must show that excepting such debts from discharge would impose an undue hardship on them and their dependents. 11 U.S.C. § 523(a)(8); *In re Hanson*, 397 F.3d 482, 484 (7th Cir. 2005).

The *Brunner* test for undue hardship adopted by this Circuit requires a three-part showing by the debtor: (1) that he cannot maintain, based on current income and expenses, a "minimal" standard of living if forced to repay the loans; (2) that additional circumstances exist indicating this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that he has made good faith efforts to repay the loans. *Roberson*, 999 F.2d at 1135. The Bankruptcy Code does not define "undue hardship," but the statutory language suggests that Congress did not mean to permit "garden-variety" hardship of the kind accompanying all bankruptcy filings. *O'Hearn v. Educ. Credit Mgmt. Corp. (In re O'Hearn)*, 339 F.3d 559, 564 (7th Cir. 2003). The debtor bears the burden of proving all three elements by a preponderance of the evidence. *Goulet v. Educ. Credit Mgmt. Corp.*, 284 F.3d 773, 777 (7th Cir. 2002) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)). A debtor who fails to establish any one of the elements does not meet his burden and, consequently, the court need not proceed with the remainder of the inquiry. *Id.*

### A.  *Minimal Standard of Living*

The first *Brunner* prong focuses on "the debtor's current financial condition to see if payment of the loans would cause his standard of living to fall below that minimally necessary."

*Roberson*, 999 F.2d at 1135. Courts examine the debtor's current income and expenses and disregard any unnecessary or unreasonable expenses that could be reduced to allow for payment of debt. *Larson v. United States (In re Larson)*, 426 B.R. 782, 789 (Bankr. N.D. Ill. 2010).

It is clear that Williams' current income exceeds his necessary expenses. He earns about $600 per month during the work season and $390 per month for unemployment when laid off, and receives $294 per month for food. That does not seem like enough to satisfy the minimal living needs of an adult but Williams stipulated to monthly expenses of only $520.[3] The math alone reflects that whether working or not, he has enough funds to cover his daily needs. Indeed, Williams has no dependents and is not obligated to pay rent or utilities or a car note. And most of the expenses considered necessary for a basic standard of living[4] are provided for by his aunt, a situation he does not expect to change. Furthermore, Williams is certainly "entitled to allocate a small amount of monthly income to discretionary or recreational purposes," *Larson*, 426 B.R. at 789 (citation omitted), but $200 per month for cigarettes is simply excessive.

Because of his limited income, Williams qualifies for IBR plans requiring him to pay nothing each month on his student loans, so in essence, he can take care of himself and "repay" the student loan debt. That is not to say that debtors cannot ever establish undue hardship where the IBR plan payment is zero. *See Durrani v. Educ. Credit Mgmt. Corp. (In re Durrani)*, 311 B.R. 496, 506 (Bankr. N.D. Ill. 2004) (collecting cases). However, in this case, with his earnings and aunt's financial support, Williams has been able to remain in good standing on his student loans,

---

[3] If the court credits Williams' trial testimony about a higher food cost, the number may increase to $600. However, that does not change the analysis here.

[4] The court acknowledges that these expenses include "basic necessities such as food, shelter, clothing and medical treatment." *Larson*, 426 B.R. at 789. However, Williams did not present any testimony or evidence of expenses beyond food, transportation and cigarettes. As previously indicated, he estimated a monthly spend of $520 (stipulation) to $600 (trial testimony).

8

meet his necessary expenses *and* spend quite a bit on discretionary items like cigarettes and eating out for lunch.

Even though Williams is able to currently meet his minimal needs, he nonetheless contends that he could never afford the actual amount due on his student loans if forced to repay them today.[5] That is highly possible, given the current balance of nearly $450,000 continues to multiply as a result of capitalized interest and no payments on the debt, but it is not Williams' situation now. He owes a monthly payment of $0, not $2,574, and there is no question he can "pay" that and still maintain a minimal standard of living. Williams bears the burden of establishing by a preponderance of the evidence the first prong of the *Brunner* test. This he has not done. That ends the court's inquiry as the debts are deemed non-dischargeable. *Roberson*, 999 F.2d at 1135. The court will nonetheless address the remaining two factors.

### B.  *Additional Circumstances*

The second *Brunner* prong asks whether additional circumstances exist that would indicate that Williams' inability to pay is likely to persist for a significant portion of the repayment period. *Tetzlaff v. Educ. Credit Mgmt. Corp.*, 794 F.3d 756, 759 (7th Cir. 2015) (citation omitted). The Seventh Circuit has expanded on this prong by stating that student loan discharges should be based on "a certainty of hopelessness" requiring evidence "of additional exceptional circumstances, strongly suggestive of continuing inability to repay." *Goulet*, 284 F.3d at 778, 779 (internal citation omitted). "Certainty of hopelessness" is a difficult standard that can generally be met only by debtors who are severely disabled, have psychiatric problems, lack usable job skills or have very limited education. *Carter v. Sallie Mae (In re Carter)*, 517 B.R. 870, 876 (Bankr. N.D. Ill.

---

[5] If Williams changed to the standard repayment plan for the ECMC loan, his monthly payment would be $2,574.66. (Klisch Decl. ¶ 11).

9

2014). Dischargeability of student loans should be based upon the certainty of hopelessness for a significant portion of loan repayment period, not simply a present inability to fulfill financial commitment. *Roberson,* 999 F.2d at 1136 (citing *In re Briscoe,* 16 B.R. 128, 131 (Bankr. S.D.N.Y. 1981)).

Here, Williams has not established that an inability to pay that is likely to continue for the foreseeable future. "[U]ndue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from factors beyond his reasonable control." *Roberson,* 999 F.2d at 1136 (internal citation omitted). To demonstrate that a debtor's state of affairs is likely to persist, "a debtor must precisely identify [his] problems and explain how [his] condition will impair [his] ability to work in the future." *In re Vargas,* No. 10 C 4022, 2010 U.S. Dist. LEXIS 136260, 2010 WL 5395142, *5 (C.D. Ill. Dec. 23, 2010) (*citing In re Tirch,* 409 F.3d 677, 681 (6th Cir. 2005)). The court may also consider whether additional extenuating circumstances that did not exist at the time the debtor sought the loan now prevent the debtor from repayment. *Goulet,* 24 F.3d at 779.

Williams contends that he has a permanent learning disability in the areas of writing and organization, as well as attention deficit disorder, and that prevents him from finding better jobs. In his pre-trial filings and during trial, Williams often referred to the Rehabilitative Services Act (29 U.S.C. 701, *et seq.*). His argument seems to be that because state rehabilitation agencies in Arizona and Illinois, that follow various federal regulations, have deemed him to have a disability that substantially impedes his ability to obtain employment, that fact cannot be challenged by defendants in this proceeding. Williams has offered no evidence of these allegedly dispositive findings. More importantly, this court is bound to follow the law as established by the Seventh Circuit. *See Reiser v. Residential Funding Corp.,* 380 F.3d 1027, 1029 (7th Cir. 2004) (explaining

that "decisions of a superior court are authoritative on inferior courts"). Thus, to the extent that Williams contends he has a disability that negatively impacts his ability to work, the argument is properly considered as part of the *Brunner* analysis.

Williams points to psychological examinations from 1983-2016 that all reach the same conclusion about the existence of a learning disability. But none of them state that he cannot work full-time and, significantly, Williams concedes that is not the case, either. Perhaps jobs requiring extensive customer service are not the best fit for someone like Williams with speech issues. Still, the court had the opportunity to observe Williams at court hearings and trial, and review his written pleadings. He presented his case well and even argued evidentiary objections at the pretrial conference. Williams occasionally stuttered or slowed down at times to gather his thoughts in response to questions, but overall, the court found him fully capable of effectively communicating his position and very well-prepared and organized in his presentation of legal arguments. There is no basis for concluding that with his advanced degrees, consistent work history for the last six years, and capable pro se representation, Williams lacks marketable job skills. *See Tetzlaff*, 794 F.3d at 760. Moreover, since Williams maintains that these disabilities have existed since 1983 – a year before he took out his first loan – he cannot rely on them now as additional circumstances that prevent him from earning a living in order to repay his debts. *See Goulet*, 24 F.3d at 779.

Substantial and credible evidence is required at trial for a debtor to sustain his burden in establishing that he has a medical issue constituting an additional circumstance under prong two of the *Brunner* test. *Greene v. U.S. Dep't of Educ. (In re Greene)*, 484 B.R. 98, 122 (Bankr. E.D. Va. 2012). Williams has not provided any evidence that his alleged conditions are severe enough or will persist long enough to impair his ability to make payments on the student loan debts in the future. *See, e.g., Spence v. Educ. Credit Mgmt. Corp. (In re Spence)*, 541 F.3d. 538, 544 (4th Cir.

11

2008) (denying undue hardship discharge and finding that 66-year old debtor's age did not constitute an additional circumstance, as "neither [the debtor's] ailments nor any other age-related health problems affect her ability to work full time."). Williams failed to prove by a preponderance of the evidence that he will be unable to make payments on his student loans for a significant portion of the repayment period.

C.  ***Good Faith Efforts to Repay***

Finally, to obtain a discharge of student loan debt, a debtor must demonstrate that he "made good faith efforts to repay the loans." *Roberson,* 999 F.2d at 1136. A debtor's good faith efforts to repay his student loans are measured by his ability to "obtain employment, maximize income, and minimize expenses." *Tetzlaff,* 794 F.3d at 760, quoting *Roberson,* 999 F.2d at 1136.

Williams is under-employed, but that, to a large extent, is due to self-imposed restrictions. First, he is focused on launching a career in the film industry despite not making much headway in the past and being openly advised to pursue other career paths. Second, Williams could be more proactive about securing additional jobs to increase his monthly income, but does not due to his belief that by the time he is laid off in late October/early November, all of the holiday season jobs are filled. Williams offered no evidence in support of his theory. Furthermore, Williams testified that during the slow season in the fall, his workweek may be reduced to as few as 10 hours, which would leave ample time for him to explore other job opportunities either concurrent with his seasonal position or to replace his off-season downtime. Williams merely assumes these limitations exist and collects his unemployment compensation instead of actively seeking to earn more money. Finally, Williams also expressed concern that if he obtained a full-time job, he was unsure how to start it without a car, suit, or shoes. But Williams is currently employed, albeit part-time and seasonally, presumably with sufficient clothing and transportation to successfully work

and be rehired for that position for the last six years. There is no reason to believe or evidence to support the notion he could not do the same with another job.

Williams testified that he has applied to 73 jobs over the last three years but the court finds that many of those positions were inconsistent with his work history and level of experience (such as Market Compliance Officer, Senior Benefits Analyst, Digital Marketing Specialist, and Financial Analyst II). (Williams' Response to ECMC's Interrogatory #3). As the Seventh Circuit has noted, "it is not uncommon for individuals to take jobs not to their liking in order to pay off their student loans, or for that matter to meet all sorts of other financial obligations." *O'Hearn*, 339 F.3d at 566. Williams' effort to obtain employment has not been as aggressive or focused as it should be, which has resulted in a failure to find additional employment and maximize his income.

Finally, "good faith is also assessed by the debtor's demonstrated efforts to pay off his existing loans." *Tetzlaff*, 794 F.3d at 760. In over thirty years, Williams has made only one payment of $140 on his student loans back in 1990 or 1991. He did not offer any explanation at trial about this or point to extenuating circumstances that might mitigate his inaction. On the other hand, Williams did present a printout from the Social Security Administration showing that since 1981, his annual income has ranged from zero to $28,500, but for the most part, fell well below $10,000. And defendants did not offer evidence that Williams was ever in default on his loans so it appears that he may have had forbearances during this time. Nevertheless, Williams started borrowing money for school in 1984 and continued through 2013, and now owes over $400,000 because he has essentially repaid none of the debt in all these years. That fact, coupled with his lack of effort to maximize employment, dooms his case. Williams has not established by a preponderance of the evidence good faith efforts to pay down his student loans.

## CONCLUSION

For all those reasons, Williams has not met his burden of establishing that repayment of his student loans would impose an undue hardship under § 523(a)(8). Judgment is entered in favor of the defendants and against the plaintiff. A separate order concurrent with this memorandum opinion will be issued.

DATED: March 8, 2018

*/s/ LaShonda A. Hunt*
The Honorable LaShonda A. Hunt
United States Bankruptcy Judge